1              IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3     UNITED STATES OF AMERICA,

4       vs.                          Criminal No. 20-169

5     ANDREW AUGUSTYNIAK-DUNCAN,

6                   Defendant.

7                                 - - -

8

9     Transcript of proceedings on November 3, 2021 United States
      District Court, Pittsburgh, Pennsylvania, before Judge
10    Arthur J. Schwab.

11

12    APPEARANCES:

13      For the Government:    Jonathan Lusty, Esq.

14
        For the Defendant:     Michael E. DeMatt, Esq.
15

16      Court Reporter:        Marsia L. Balobeck

17

18

19

20

21

22

23

24
          Proceedings recorded by mechanical stenography;
25    transcript produced by computer-aided transcription.

1                  P R O C E E D I N G S

2            (Proceedings held in Courtroom 7C)

3            THE COURT:  Good morning.  This is the time and place

4    set for evidentiary hearing relating to sentencing in criminal

5    number 20-00169.  I'd ask counsel for the government to enter

6    your appearance, please.

7            MR. LUSTY:  Good morning, Your Honor.  May it please

8    the Court, Jonathan Lusty on behalf of the government.

9            THE COURT:  On behalf of the defendant, please?

10           MR. DEMATT:  Michael DeMatt on behalf of

11   Mr. Augustyniak-Duncan.

12           THE COURT:  Sir, would you stand to be sworn, please.

13           (ANDREW AUGUSTYNIAK-DUNCAN was duly sworn.)

14           THE COURT:  Sir, do you understand that having been

15   sworn, your answers to my questions are subject to the

16   penalties of perjury or making a false declaration if you do

17   not answer truthfully?

18           THE DEFENDANT:  I do.

19           THE COURT:  You may be seated and be comfortable,

20   please.

21           On July 22, 2020, defendant was charged in a

22   one-count indictment with obstruction of law enforcement

23   during a civil disorder in violation of Title 18 United States

24   Code Sections 2 and 231(a)(3).

25           On June 2, 2021, defendant entered a plea of guilty

1    to this charge against him in the indictment.  The Court

2    ordered completion of the pre-sentence investigation report by

3    the probation office and scheduled a sentencing for October

4    13, 2021.

5         On July 29, 2021, the parties filed a joint status

6    report at document number 44, relevant to today's evidentiary

7    hearing.  The report states:

8         (1) "This Honorable Court ordered that the parties

9    confer and provide a joint status report to inform the Court

10    as to whether an evidentiary hearing is needed prior to

11    sentencing."

12        (2) "The parties agree that an evidentiary hearing is

13    not needed, as there are no disagreements as to the relevant

14    facts."

15        And (3) "The parties have reached the following

16    stipulations as to the relevant facts."  Parties then listed

17    nine stipulated facts.

18        The final pretrial investigation report was filed by

19    the probation officer on September 2, 2021 at document number

20    46.  The addendum thereafter was filed on September 24, 2021

21    at document number 56.  Relevant to today's evidentiary

22    hearing are paragraphs 20, 21 and 23 of the pre-sentence

23    investigation report.  Paragraph 20 states, "Base level

24    offense level guidelines for violation of 18 USC Section 2 is

25    USSG Section 2X2.1.  Pursuant to USSG Section 2X2.1, the

1    offense level is the same as that of an underlying offense

2    such as USSG Section 2A2.4 (obstructing or impeding officers).

3    As referenced, when determining the offense level, the base

4    level offense is 10 S 2 -- USSG Section 2A2.4(a)."

5         Paragraph 21 provides:  "Specific offense

6    characteristics:  The defendant, during the course of a civil

7    disturbance, was observed throwing a pipe and concrete at

8    Pittsburgh Police officers and at least two officers were

9    struck by objects resulting in those officers sustaining

10   concussions; therefore, under USSG Section 2A2.4(b), two

11   levels are added."

12        Paragraph 31 details defendant's state court

13   conviction for simple assault.

14        Thereafter, on September 10, 2021, defendant filed

15   his position with respect to sentencing factors in which he

16   raises two objections to the pre-sentence investigation

17   report.  Court understands the defendant's objections to the

18   pre-sentence investigation report to be as follows:  First,

19   defendant objects to paragraph 21 of the pre-sentence

20   investigation report, which provides for a two-level

21   enhancement for bodily injury pursuant to USSG 2A2.4(b).

22   Defendant explains that that paragraph provides:  "If the

23   victim sustained bodily injury, increase by two levels."

24        Defendant then argues in the instant matter, that

25   there's insufficient evidence to support a finding that

1    defendant caused bodily injury to any person, as there's no

2    evidence to indicate that any objects thrown by this defendant

3    struck anyone.  Consequently, the defendant concludes, after

4    removing the two-level enhancement from paragraph 21, several

5    other paragraphs of the pre-sentence investigation report must

6    be corrected -- must be adjusted to correct the erroneous

7    offense level calculation.  Namely:

8            (1) paragraph 25, "adjusted offense level (subtotal)

9    should be 10 rather than 12.

10           (2) paragraph 28, "total offense level" should be 8

11   rather than 10.

12           (3) paragraph 76, "guideline provisions [custody]"

13   should indicate a total offense level of 8 and a guideline

14   imprisonment range of 18 to 24 months.

15           And (4) paragraph 84, "guidelines provisions [fines]"

16   should indicate a guideline fine range of $2,000 to $20,000.

17           Defendant's second objection is that, with respect to

18   paragraph 31 of the pre-sentence investigation report,

19   defendant asserts that paragraph 31 contains a statement that,

20   "the defendant beat the victim to the point of unconsciousness

21   with a metal baseball bat."  And objects to the inclusion of

22   this statement in the pre-sentence investigation report such

23   as -- as such a statement is consistent with aggravated

24   assault, which charges were withdrawn, not a simple assault,

25   which is the offense for which defendant was actually

1    convicted.

2           In support of this argument, defendant cites 18

3    Pennsylvania Consolidated Statutes Sections 2701 for simple

4    assault and 2702 for aggravated assault.

5           On September 14, 2021, the government filed its

6    position with respect to sentencing factors in which it also

7    raises objections to the pre-sentence investigation report and

8    document number 50.  Court understands the government's

9    objection to the pre-sentence investigation report is that the

10   government objects to the offense level calculation in the

11   pre-sentence investigation report; specifically, the

12   government argues that although the base offense level listed

13   in paragraph 20 of the report, which is 10 pursuant to USSG

14   section 2A2.4(a) is correct as the starting point for the

15   guidelines, the cross reference listed in Section 2A2.4(c)(1)

16   should be applied because defendant's conduct constituted,

17   "aggravated assault" as that term is defined in the sentencing

18   guidelines; and therefore, Section 2A2.2 titled:  "Aggravated

19   assault" is the applicable section of the guidelines.

20          The government then argues that since Section 2A2.2

21   applies, the correct base level -- the correct base offense

22   level is 14, not 10, as stated in that paragraph.  Then the

23   offense level should be increased by four levels under Section

24   2A2.2(b)(2)(B) because a dangerous weapon was used.

25          Finally, the government maintains that the victims

1    sustained bodily injury, in other words, concussions, as a

2    result of defendant's action, so offense level should be

3    increased by a level 3 under 2A2.2(b)(3)(A); therefore, the

4    government calculates the adjusted offense level as 21,

5    applying a three-level reduction for acceptance of

6    responsibility, the government's position is that the total

7    offense level should be 18.

8         Upon review of the parties' objections to the

9    pre-sentence investigation report and stipulations entered

10   into by the parties, although the patients agreed that an

11   evidentiary hearing is not necessary, the Court determined

12   that in order to properly address the objections raised by the

13   parties, it was necessary to receive evidence on these issues

14   as raised by the objections by both parties.

15        Accordingly, on September 17, 2020, the Court ordered

16   an evidentiary hearing with respect to the parties' position

17   with respect to sentencing factors for September 29, 2021,

18   which was continued at the request of the defendant to today

19   November 3rd, 2021.

20        On behalf of the defendant, counsel, is that an

21   accurate summary of the defendant's objection to the

22   pre-sentence investigation report and the procedural history

23   surrounding today's evidentiary hearing?

24        MR. DEMATT:  Yes, Your Honor.

25        THE COURT:  As to the government, is that an accurate

1    summary of the government's objections to the pre-sentence

2    investigation report and the procedural history surrounding

3    today's hearing?

4            MR. LUSTY:  Yes, Your Honor.

5            THE COURT:  Do you agree that the government has the

6    burden of proof in this situation?

7            MR. LUSTY:  Yes, Your Honor.

8            THE COURT:  Is the government ready to proceed?

9            MR. LUSTY:  We are.

10           THE COURT:  You may.  And for your questioning, you

11   may take down your mask.

12           MR. LUSTY:  Thank you, Your Honor.  The government

13   calls Detective Brittany Miles.

14           THE DEPUTY CLERK:  Please state and spell your name.

15           THE WITNESS:  Brittany, B-R-I-T-T-A-N-Y, Miles,

16   M-I-L-E-S.

17           THE DEPUTY CLERK:  Raise your right hand.

18           (BRITTANY MILES was duly sworn.)

19           THE COURT:  On behalf of the defendant, do you want

20   the witnesses sequestered?

21           MR. DEMATT:  Yes, Your Honor.

22           THE COURT:  So ordered.  Counsel for both sides are

23   responsible for enforcing that order since I don't know

24   actually who are the actual witnesses.

25           Ma'am, are you comfortable.

1          THE WITNESS:  Yes.

2          THE COURT:  You may begin.

3          MR. LUSTY:  Thank you, Your Honor.

4              D I R E C T   E X A M I N A T I O N

5     BY MR. LUSTY:

6     Q.  Detective, can you state your name.

7     A.  Detective Brittany Miles.

8     Q.  How are you employed?

9     A.  City of Pittsburgh detective in the plainclothes office.

10    Q.  How long have you been a Pittsburgh Police officer?

11    A.  11 years.

12    Q.  How long have you been a plainclothes detective?

13    A.  Four.

14    Q.  Were you involved in the investigation related to the

15    rioting during the protests in Downtown Pittsburgh on May 30,

16    2020?

17    A.  Yes, I was.

18    Q.  How did you become involved?

19    A.  I was assigned to our DAT unit, which was in charge of

20    investigating the riots that occurred downtown.

21    Q.  What is the DAT unit?  What does that stand for, if you

22    know?

23    A.  I don't remember.

24    Q.  Was this a unit specially created to identify individuals

25    involved and to investigate?

1    A.  Yes, it was.

2    Q.  At some point, did you become aware that Officers Kelliane

3    Sisak and Andrew Tantanella were struck by objects while

4    standing on Sixth Avenue between Smithfield and Wood Street

5    around 6:30 p.m. on that day, May 30, 2020?

6    A.  Yes.

7    Q.  As part of this investigation, was video collected from

8    Downtown Pittsburgh?

9    A.  Yes.

10   Q.  Who collected video?

11   A.  Our computer crime unit.

12   Q.  And where was video collected from?

13   A.  Video was collected from the Port Authority substation

14   located at Wood and Sixth Avenue, the CNG Tower, a multitude

15   of locations, the Heinz 57, which covers the entire corridor

16   of Smithfield and Sixth Avenue.

17   Q.  Is it fair to say that the goal was to find any video that

18   was available from that day?

19   A.  Yes.

20   Q.  And you and I have discussed the videos and the exhibits

21   in this case prior to today, is that correct?

22   A.  Yes.

23   Q.  And then before we started this morning, you again came to

24   my office and reviewed the exhibits, is that correct?

25   A.  Correct.

1   Q.  And you reviewed what is marked as government exhibit 1,

2   that was entered as an attachment to the sentencing

3   memorandum?

4   A.  Yes.

5   Q.  And that video, generally what does that depict?

6   A.  Exhibit 1 was Sixth Avenue and Wood Street.

7           MR. LUSTY:  Move to admit government exhibit 1.

8           THE COURT:  Any objection?

9           MR. DEMATT:  No objection, Your Honor.

10          THE COURT:  And you've had an opportunity to review

11  all these videos previously, correct?

12          MR. DEMATT:  I have, Judge, thank you.

13          THE COURT:  It will be admitted without objection.

14          MR. LUSTY:  Thank you, Your Honor.  I think it's

15  loading.  It was working before we started.  I'll try to

16  restart it again.

17          THE COURT:  So you're going to play the video?

18          MR. LUSTY:  Yes, I will.

19          THE COURT:  How long is the video, please?

20          MR. LUSTY:  About nine minutes, but I'm not going to

21  play the entire nine minutes.

22          THE COURT:  Just make sure you put on the record what

23  portions you play and the start time in and time out of each

24  portion, please.

25          MR. LUSTY:  Yes, Your Honor.  Your Honor, I'm going

1    to try to restart my computer.  I don't know what --

2              THE COURT:  Okay.  Take your time.

3    BY MR. LUSTY:

4    Q.  Detective Miles, do you see the video on your screen?

5    A.  Yes, I do.

6    Q.  And is that the WS exterior of Sixth and Wood labeled from

7    063200 to 063800 video?

8    A.  Yes, it is.

9    Q.  And at the bottom, does it indicate this video clip starts

10   at 6:32:05 p.m.?

11   A.  Yes, it does.

12   Q.  So 6:32 p.m.?

13   A.  Yes, it does.

14   Q.  And starting at that point, at the top of the screen where

15   I'm circling by -- behind the green awning, who was located

16   back in that direction?

17   A.  That was the mobile field force, specifically Officer

18   Kelly Sisak and Andrew Tantanella.

19   Q.  Other officers were with them as well?

20   A.  Correct.

21   Q.  And closer to us on that screen in that same general area,

22   is there a large crowd of people?

23   A.  Yes.

24       (Playing video)

25   Q.  And at 6:32:30, do you see that crowd of people running

1    down towards the bottom of the screen?

2    A.  Yes.  They're running towards Wood, Wood Street.

3    (Playing video)

4    Q.  We're at 6:32:45, there's smoke at the top of the screen,

5    at the top left part of the screen.  Who is standing in that

6    area?

7    A.  That is the mobile field force, Officers Kelly Sisak and

8    Andrew Tantanella.

9    THE COURT:  So I understand where you are, do you see

10    that green awning on the left?  Ma'am, do you see that?

11    THE WITNESS:  Yes, I do.

12    THE COURT:  What is that?

13    THE WITNESS:  I'm not specifically sure what

14    business.  It's just an awning to a business on Sixth Avenue.

15    BY MR. LUSTY:

16    Q.  And Detective, there is another video, exhibit 2, that

17    shows this from an opposite direction, is that correct?

18    A.  That's correct.

19    Q.  At this point, 6:33:43 --

20    THE COURT:  Just so I -- looking where the smoke is,

21    that's Smithfield going left to right?

22    THE WITNESS:  Yes.

23    THE COURT:  And the green, the tree and the sort of

24    like 3 inches in, is that at the Mellon Square Park over on

25    the right?

1          THE WITNESS:  No, Mellon Square Park is a little

2     further up.  The tree right here on the right-hand side,

3     that's by the church.

4          THE COURT:  Okay.  The one -- never mind.  Go ahead.

5     BY MR. LUSTY:

6     Q.  And just to clarify, the red car at the bottom of the

7     screen, is that on Wood Street?

8     A.  Yes.

9     Q.  And at this point, it's 6:33:43, is the crowd starting to

10    move again towards the bottom of the screen?

11    A.  Yes.

12       (Playing video)

13    Q.  And is there a stop sign that looks like one side is a

14    stop sign, the other side is an orange sign being carried at

15    6:33:57, that person is also moving in this direction?

16    A.  Yes.

17          THE COURT:  And that camera is coming from Port

18    Authority station?

19          THE WITNESS:  Correct.

20       (Playing video)

21    Q.  Pausing it at 6:34:08, at the top below the yellow street

22    sign, there's a group of individuals.  Who is that?

23    A.  That is the Pittsburgh Police officers and the mobile

24    field force line.

25    Q.  So that's the group of officers that were previously

1    further back towards Smithfield?

2    A.  Correct.

3    Q.  And they've been approaching where the crowd was?

4    A.  Correct.

5    (Playing video)

6    Q.  Here at 6:34:30, has the crowd now moved to Wood Street at

7    this point?

8    A.  Yes.

9    (Playing video)

10   Q.  Pausing at 6:34:40, do you see an individual, his leg is

11   above the orange traffic cone, wearing jeans, a black shirt

12   and a gas mask along with a backpack?

13   A.  Yes, I do.

14   Q.  Were you later able to identify who that individual is?

15   A.  Yes, I was.

16   Q.  Who is that individual?

17   A.  Andrew Augustyniak-Duncan.

18   THE COURT:  Do you want to put the arrow on that person,

19   please.  Thank you.

20   Q.  And do you see that individual in the courtroom today?

21   A.  Yes, I do.

22   Q.  Where is he seated?

23   A.  In the back right-hand courtroom wearing a red jumpsuit.

24   MR. LUSTY:  Can the record reflect identification of

25   the defendant?

1    THE COURT:  Sure, fine.  Do you want me to say yes?

2    MR. LUSTY:  Fine.  Thank you.

3 BY MR. LUSTY:

4 Q.  At this point, do you see the defendant moving throughout

5 the Wood Street area?

6 A.  Yes, I do.

7    (Playing video)

8 Q.  At this point, at 6:34:55, did he run off the screen?

9 A.  Yes.

10 Q.  At this point, I'm going to fast forward to 6:37:45.

11    (Playing video)

12    Do you see the defendant return to the screen?

13 A.  Yes, I do.

14 Q.  Where is he?

15 A.  He is in the bottom left-hand corner of the screen.

16 Q.  Is this him at the bottom left, about to throw an object?

17 A.  Yes, it is.

18 Q.  And that object, what did it appear to be to you?

19 A.  It appeared to be just a water bottle.

20 Q.  Did it appear to strike anybody?

21 A.  No.

22 Q.  Exhibit 2, we also reviewed that video, is that correct?

23 A.  That's correct.

24 Q.  And what does that generally show?

25 A.  That is the view from Sixth Avenue closer to the mobile

1    field force line.

2    Q.  So kind of the reverse angle of what we just saw?

3    A.  Yes.

4         MR. LUSTY:  Move to admit government exhibit 2.

5         MR. DEMATT:  No objection.

6         THE COURT:  Admitted without objection.

7    BY MR. LUSTY:

8    Q.  At this point I'm going to play government exhibit 2.

9      (Playing video)

10     Detective, is this video from the same general timeframe

11   from the other video we just watched?

12   A.  Yes, it is.

13   Q.  At approximately 2:50 of this video, 2:48, do you see an

14   individual coming into the bottom right of the screen?

15   A.  Yes, I do.

16   Q.  Who is that?

17   A.  Andrew Augustyniak.

18   Q.  At 3:02, do you see him do something?

19   A.  Yes.  He picks up a part of the concrete planter.

20   Q.  Is this him next to the dirt pile?

21   A.  Yes.

22   Q.  At 3:06, does he briefly walk off screen?

23   A.  Yes, he does.

24   Q.  Here at 3:14, is he back on screen, still holding the

25   object he picked up?

1    A.  Yes.

2    Q.  What do you see him do between 3:14 and 3:21?

3    A.  He throws the object towards the mobile field force line.

4    Q.  Now, to the right --

5        THE COURT:  Put the arrow on him, please.  Back it

6    up.  Put the arrow on him.

7        MR. LUSTY:  I can show it one more time.

8     (Playing video)

9        MR. LUSTY:  He's right at the top right of the

10   screen.

11       THE COURT:  Thank you.

12   BY MR. LUSTY:

13   Q.  And the mobile field force, including Officer Sisak and

14   Officer Tantanella, were they to the area that would be to the

15   right of this screen just off of this screen?

16   A.  Correct.

17   Q.  Not captured by video?

18   A.  Not captured, no.

19   Q.  And at the top of the screen, do you see that same stop

20   sign that we saw from the different angle?

21   A.  Yes, I do.

22   Q.  With the person moving away from where the officers were

23   towards the Wood Street?

24   A.  Yes.

25     (Playing video)

1    Q.  And at 3:31 -- back it up to 3:25.  Is the defendant back

2    in that area where he found the piece of concrete?

3    A.  Yes, he was.

4    Q.  And what does he appear to be doing?

5    A.  I thought he was going to pick up another object, but it

6    appears he does not.

7    Q.  And then is this the point of the video where the officers

8    move forward and the crowd moves back?

9    A.  Yes.

10       (Playing video)

11   Q.  And we will stop playing at 3:47 on that video.  We also

12   reviewed government exhibit 3.  That is a still photo from

13   government exhibit 2, is that correct?

14   A.  Yes.

15            MR. LUSTY:  Move to admit government exhibit 3.

16            THE COURT:  Any objection?

17            MR. DEMATT:  No objection.

18            THE COURT:  Admitted without objection.

19   BY MR. LUSTY:

20   Q.  On the right side of government exhibit 3, what do you

21   see?

22   A.  Andrew Augustyniak holding a concrete planter.

23            THE COURT:  That's in his right hand, is that

24   correct?

25            THE WITNESS:  Correct.

1    BY MR. LUSTY:

2    Q.  Now, that incident occurred around 6:32 to 6:34 in the

3    evening.  Were there other videos found that showed the

4    defendant throwing objects at other officers prior to that?

5    A.  Yes, there was.

6    Q.  And one of those, government exhibit 4, that video, you

7    and I have reviewed, is that correct?

8    A.  Correct.

9           MR. LUSTY:  Move to admit government exhibit 4.

10          THE COURT:  Any objection?

11          MR. DEMATT:  No objection.

12          THE COURT:  Admitted without objection.

13          MR. LUSTY:  Your Honor, this is a short video clip.

14   It begins at 6:04:15.

15      (Playing video)

16          THE COURT:  So looking at the center left is Mellon

17   Square Park, correct?

18          THE WITNESS:  Correct.

19          THE COURT:  On Smithfield, looking towards the Mon

20   River?

21          THE WITNESS:  Correct.

22          THE COURT:  And the building on the bottom right is

23   the old Gimbel's building before you were born.

24          THE WITNESS:  I'll take your word for it.

25   BY MR. LUSTY:

1    Q.  Detective, do you see this individual with his hands up

2    wearing a black shirt and it appears black shorts?

3    A.  Yes, I do.

4    Q.  Is that the area where the defendant will come into the

5    video?

6    A.  Yes, it is.

7       (Playing video)

8    Q.  And it's 6:04:20.  Is that the defendant at the bottom

9    right of the screen appearing to make a throwing motion?

10   A.  Yes, it is.

11   Q.  And the area where he was throwing it, are there officers

12   in that area?

13   A.  Yes.

14   Q.  Based on what you know, were any of them struck with that

15   object?

16   A.  Based on what I know, they were not.

17   Q.  We've also reviewed government exhibit 5, another video

18   that shows this event from another angle, is that correct?

19   A.  That's correct.

20         MR. LUSTY:  Move to admit government exhibit 5.

21         THE COURT:  Any objection?

22         MR. DEMATT:  No objection.

23         THE COURT:  Admitted without objection.

24      (Playing video)

25   BY MR. LUSTY:

1    Q.  At 6:04:19, at the top right of the screen, is that the

2    defendant --

3    A.  Yes, it is.

4    Q.  -- about to throw on object?

5    A.  Yes, it is.

6    Q.  And what does that object appear to be?

7    A.  A metal pipe.

8    Q.  And finally, did we review government exhibit 6, which is

9    a still photo from that last video, government exhibit 5?

10   A.  Yes.

11           MR. LUSTY:  Move to admit government exhibit 6.

12           THE COURT:  Any objection?

13           MR. DEMATT:  No objection.

14           THE COURT:  Admitted without objection.

15   BY MR. LUSTY:

16   Q.  And once again, is that the defendant holding a pipe just

17   prior to throwing it in the direction of the officers?

18   A.  Yes, it is.

19   Q.  Now, you've reviewed other surveillance video involving

20   this incident other than the ones we've shown today, correct?

21   A.  Correct.

22   Q.  To be clear, in any of those videos, is there a video that

23   shows the defendant throwing an object and showing that object

24   then striking either Officer Tantanella or Officer Sisak?

25   A.  Yes.

1    Q.  Is there any video that shows him throwing an object and

2    following that object until it strikes the officers?

3    A.  No, there's not.

4          MR. LUSTY:  No further questions.  Offer for cross.

5          THE COURT:  Any questions?

6          MR. DEMATT:  Yes.  Thank you, Your Honor.

7          THE COURT:  You can take your mask down while you're

8    asking questions, please.  Thank you.

9          C R O S S - E X A M I N A T I O N

10   BY MR. DEMATT:

11   Q.  Good morning, ma'am.  With respect to the videos that you

12   observed, would you agree with me that in the videos, you can

13   see other individuals throwing objects during the course that

14   this was going on?

15   A.  Yes.

16   Q.  In fact, there were some other objects that were thrown

17   close in time to the incident where you see

18   Mr. Augustyniak-Duncan throwing?

19   A.  Yes.  And those people were charged separately.

20   Q.  Just to clarify, I think just to make sure we're all on

21   the same page, none of the videos show where, apart from that

22   water bottle that we saw in the one video, you can't see where

23   any of the objects that Mr. Augustyniak-Duncan threw, where

24   they landed?

25   A.  There was another video that wasn't able to be retained

1    due to it expiring in such a short timeframe.  But the exact

2    moment that Officer Kelly Sisak was struck was 18:32 hours,

3    which was the same time from the video that you did see that

4    Andrew Augustyniak was throwing the concrete planter.

5    Q.  If I may, that really didn't answer my question.  Was

6    there any video that showed where any object that

7    Augustyniak -- Mr. Augustyniak-Duncan threw, where those

8    objects landed, apart from that water bottle that we saw?

9    A.  No.

10   Q.  And now with respect to -- you had indicated -- you just

11   volunteered some information about the one officer being

12   struck at 18:32 hours, which would be 6:32 p.m., correct?

13   A.  Correct.

14   Q.  And there was a time stamp on exhibit 1, I believe,

15   indicating that that started -- that video started at 6:32,

16   correct?

17   A.  Correct.

18   Q.  And objects were being thrown at some point after that, a

19   few minutes into the video, right?

20   A.  Correct.

21        MR. DEMATT:  I have no further questions.

22        THE COURT:  Any redirect?

23        MR. LUSTY:  No, Your Honor.

24        THE COURT:  May the witness be excused on behalf of

25   the government?

1          MR. LUSTY:  Yes.

2          THE COURT:  Defendant?

3          MR. DEMATT:  Yes, Your Honor.

4          THE COURT:  Ma'am, you may step down.  Be careful,

5    you have to climb up and climb down that little step there,

6    please.

7          THE WITNESS:  Thank you.

8          THE COURT:  Thank you.

9          MR. LUSTY:  Government has one additional witness,

10   Officer Sisak.

11         THE DEPUTY CLERK:  Please state and spell your name

12   for the record.

13         THE WITNESS:  Kelliane, K-E-L-L-I-A-N-E, Sisak,

14   S-I-S-A-K.

15         (KELLIANE SISAK was duly sworn.)

16              D I R E C T   E X A M I N A T I O N

17   BY MR. LUSTY:

18   Q.  Officer, can you please tell the Court how you're

19   employed.

20   A.  City of Pittsburgh Police.

21   Q.  How long have you been a Pittsburgh police officer?

22   A.  Since 2018.

23   Q.  Were you working on May 30, 2020 as a Pittsburgh police

24   officer?

25   A.  I was.

1    Q.  What was your shift that day?

2    A.  I was a daylight shift, so I was 0700 to 1500 hours, but I

3    was also detailed to our SRT team.

4    Q.  And were you part of the SRT team at approximately 6:30

5    p.m. that evening?

6    A.  I was.

7    Q.  And what --

8            THE COURT:  What does SRT stand for?

9            THE WITNESS:  Special response team.

10   BY MR. LUSTY:

11   Q.  And what were you responding to that night?

12   A.  We were responding to rioting that was occurring downtown.

13   Q.  Were you standing on Sixth Avenue somewhere between

14   Smithfield Street and Wood Street around 6:30 p.m.?

15   A.  I was.

16   Q.  And at some point while you were standing there, were you

17   struck with an object?

18   A.  Yes, I was.

19   Q.  Can you tell the Court what happened.

20   A.  We were standing in a line and at some point something

21   heavy and hard hit my head.  I didn't see it.  I'm not sure

22   what it was at the time.  But it knocked me off of the line.

23   Q.  What did you do after you were -- when you say you were

24   knocked off the line, what does that mean?

25   A.  It knocked me off my feet.  I had to stumble back and

1  catch my bearings and then approach the line again.

2  Q.  How long were you back off -- were you back on the line

3  permanently or did you leave at some point?

4  A.  I was removed from the line by my team leader.

5  Q.  Did you suffer any injuries when you were struck?

6  A.  I sustained a concussion and whiplash in my neck.

7  Q.  What type of uniform were you wearing when you were

8  struck?

9  A.  Our SRT uniform.

10  Q.  Does that include any kind of special helmet?

11  A.  Yes, it does.

12  Q.  Was there any damage to the helmet?

13  A.  Yes, there was.

14  Q.  What was the damage?

15  A.  There were scratches and I believe a crack in the screen.

16  Q.  Do you have any ongoing symptoms as a result of your

17  injuries?

18  A.  I still get migraines and neck pain.

19  Q.  And this is about a year and a half later.  Are you still

20  undergoing any treatment?

21  A.  Self-treatment.

22  Q.  We've met prior to today to discuss this, and we again met

23  this morning, is that correct?

24  A.  That's correct.

25      (Playing video)

1  Q.  I'm going to show you what's already been admitted as

2  government exhibit 1.  Do you recognize this video taken from

3  Sixth and Wood Street?

4  A.  I do.

5  Q.  And where were you and the other officers in this video?

6  A.  We are in the back towards where the mouse is, closer to

7  Smithfield Street.

8  Q.  And that's at 6:32:02 correct?

9  A.  That's correct.

10     (Playing video)

11  Q.  At the bottom of the screen.  Fast forwarding to 6:33:12,

12  do you see the line of officers moving up at that point?

13  A.  I do.

14     (Playing video)

15  Q.  And at 6:33:50, are the officers continuing to move up?

16  A.  Yes.

17  Q.  And at that point, is the crowd of people that was

18  standing there in the middle of the Sixth Avenue between Wood

19  Street and Liberty -- Smithfield, moving back towards Wood

20  Street?

21  A.  Yes.

22     (Playing video)

23  Q.  Now this is at 6:34:12, are you still on the line at that

24  point?

25  A.  No, I don't believe so.

1  Q. So your recollection is at this point when the officers

2  are moving forward, you were already off the line?

3  A. Correct.

4  Q. Do you have a clear memory of everything that happened

5  that day?

6  A. No.

7  Q. I mean you were obviously -- you suffered a head injury,

8  is that correct?

9  A. Right.

10  Q. Were you transported to the hospital from here?

11  A. Yes.

12  Q. But your best recollection is you were standing near Wood

13  Street, and by the time that the officers moved forward, you

14  were no longer there?

15  A. Correct.

16  Q. So at that point, obviously, you had already been struck,

17  is that fair to say?

18  A. Yes.

19          MR. LUSTY:  Offer for cross.

20          THE COURT:  Any questions?

21          MR. DEMATT:  Yes.  Thank you, Your Honor.

22              C R O S S - E X A M I N A T I O N

23  BY MR. DEMATT:

24  Q. Good morning, ma'am.  With regard to the object that

25  struck you, you never actually saw it, did you?

1    A.  I did not.

2    Q.  So you have no idea, from your own recollection, where it

3    came from?

4    A.  The general direction, yes, but I don't know who threw it.

5    I did not see that.

6    Q.  I thought that you said you did not actually see the

7    object.

8    A.  I did not.  But there was really only one direction it

9    could have come from, which is in front of us.

10   Q.  But as far as where in the crowd -- there was a crowd of

11   people in front of you, correct?

12   A.  Correct.

13   Q.  But you couldn't tell where in the crowd that it came

14   from, just that it came generally from that direction?

15   A.  Yes.

16   Q.  And with respect to the -- you called it SRT --

17   A.  Correct.

18   Q.  -- uniform that you were wearing, and that would include a

19   helmet with a face shield, right?

20   A.  Correct.

21   Q.  Body armor, correct?

22   A.  We were not allowed to have our body armor.  We just had

23   bulletproof vests on.

24   Q.  So you had bulletproof vests on.  Was there also a shield

25   or no?

1    A.  No.

2    Q.  And everyone along that line were equipped basically the

3    same, correct?

4    A.  Correct.

5            MR. DEMATT:  Thank you.  I have no further questions.

6            THE COURT:  I have a couple of questions.  So,

7    although you don't know what the object was that hit you in

8    the scheme of, I guess, a tennis ball to a brick, along that

9    range -- you felt it hit you, correct?

10           THE WITNESS:  Correct.

11           THE COURT:  You saw some damage to your helmet?

12           THE WITNESS:  Correct.

13           THE COURT:  So where, along that spectrum, do you

14   believe the object was in light of what you felt and the

15   damage done to the helmet?

16           THE WITNESS:  I would believe closer to the size of a

17   brick due to it did knock me off of my feet.

18           THE COURT:  Was it an empty bottle?

19           THE WITNESS:  No.

20           THE COURT:  Any additional questions on behalf of the

21   government?

22           MR. LUSTY:  No, Your Honor.

23           THE COURT:  Sir, any additional questions?

24           MR. DEMATT:  No, Your Honor.

25           THE COURT:  May the witness be excused on behalf of

1      the government?

2                  MR. LUSTY:  Yes, Your Honor.

3                  THE COURT:  Defendant?

4                  MR. DEMATT:  Yes.

5                  THE COURT:  You may step down, ma'am.  Any additional

6      evidence?

7                  MR. LUSTY:  No, Your Honor.

8                  THE COURT:  Any evidence on behalf of the defendant?

9                  MR. DEMATT:  No evidence, Your Honor.

10                 THE COURT:  Any objection to my declaring the record

11     closed?

12                 MR. LUSTY:  No, Your Honor.

13                 THE COURT:  Any objection to my declaring the record

14     closed?

15                 MR. DEMATT:  No.

16                 THE COURT:  I'll declare the record closed.  How do

17     you want to proceed now on behalf of the government?  Do you

18     want to do findings of fact, conclusions of law?  Do you want

19     us to enter an opinion?  What is your suggestion in light of

20     the testimony?

21                 MR. LUSTY:  Your Honor, we're okay -- if the Court

22     wants to enter an opinion, we're okay to proceed that way.

23                 THE COURT:  On behalf of the defendant, do you want

24     to do findings of fact, conclusions of law or not?

25                 MR. DEMATT:  No, Your Honor, I don't think that's

1    necessary.

2              THE COURT:  On behalf of the government, defendant,

3    do you both agree that we should order a transcript, half the

4    cost paid by the government, half the cost paid by of the

5    defendant?  Defendant needs to submit the proper CJA form.

6              MR. DEMATT:  Yes.

7              THE COURT:  Agreed?

8              MR LUSTY:  Yes, on behalf of the government.

9              THE COURT:  Anything else you would like to talk

10   about on this beautiful, sunny day in the 'burgh?

11             MR. LUSTY:  No, Your Honor.

12             THE COURT:  Anything else?

13             MR. DEMATT:  No, Your Honor.

14             THE COURT:  Everyone remain seated, the marshals may

15   remove the defendant.

16                          I N D E X

17                    DIRECT          CROSS

18   Brittany Miles        9             23

19   Kelliane Sisak        25            29

20               C E R T I F I C A T E

21        I, MARSIA L. BALOBECK, certify that the foregoing
     is a correct transcript from the record of proceedings in the
22   above-entitled case.

23

24    \s\ Marsia L. Balobeck        11/23/2021___
     MARSIA L. BALOBECK             Date of Certification
25   Official Court Reporter